# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00993-COA

**FAIRLEY CONSTRUCTION SERVICES, INC.**                    APPELLANT

**v.**

**JAMES SAVAGE**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 06/16/2017 |
| TRIAL JUDGE: | HON. JON MARK WEATHERS |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT P. THOMPSON |
| | CARYN L. MILNER |
| ATTORNEYS FOR APPELLEE: | LAWRENCE C. GUNN JR. |
| | ANN L. GRIFFIN |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED: 01/31/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GRIFFIS, C.J., FOR THE COURT:**

¶1.    Fairley Construction Services Inc. appeals from a judgment entered on a jury verdict in a personal injury action in favor of James Savage. The jury found that Savage suffered total damages of $460,000, that Fairley was 80% at fault, and that Savage was 20% at fault. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.    Fairley was hired to construct a quick-lube automobile service facility. The facility was divided into four separate sections or "bays." The first bay was on the south end of the building and was used as an office and customer waiting area. The other three bays were

used as a garage area for vehicle maintenance. The facility also included a basement with three openings to the main floor of the facility. Two of the openings were "oil pits" that allow the facility's mechanics to access the underside of vehicles for an oil change. The oil pits were approximately eight-feet deep.

¶3. Fairley ordered construction materials, including sheetrock, from ProBuild. ProBuild was a distributor of lumber and construction materials. Savage was a delivery driver for ProBuild.

¶4. On May 14, 2013, Savage delivered sheetrock to Fairley's construction site. When Savage arrived, none of Fairley's employees were present. Savage inspected the construction site and determined the best and safest location for him to place the sheetrock. Savage determined that the first bay – the office area – appeared to be too cramped to unload the sheetrock. He also determined that the second and fourth bays were blocked by machinery. As a result, Savage decided to unload the sheetrock in the third bay. While he was unloading the sheetrock, Savage fell into the oil pit.

¶5. At the time of the delivery, each oil pit was covered by a 4-foot by 8-foot sheet of plywood. Savage claimed that the oil pits were concealed and unable to be seen. The plywood was not fastened or attached to the floor. And there were no warning signs, cones, or any other type of warning that advised or alerted Savage of the presence of the oil pits or openings into the basement.

¶6. Savage explained his accident as follows:

> [W]hen I pulled up to the door where I was going to put the [s]heetrock in, the [s]heetrock is 4 feet by 12 feet, and when I pulled up to the door, I determined

that the door was not wide enough to slide it in straight because there was not enough clearance; so the way we do things like that is you turn it sideways. You put the 4 foot side in . . . and you set it down, and you try to - on our forklifts, we have a side shift, and you can side shift it. You will set it down and side shift it as far as you can, and then you would go. You would set it down, come out from under it, and you would go to the other end. Pick the other end up. Level it and slide it in the building.

. . . .

[However,] when I - when I looked in, I saw the plywood on the floor, and I determined that it was not enough room to - not enough - at least 12 to 13 feet to where you can safely slide the [s]heetrock in; so I went in to move the . . . plywood forward so the [s]heetrock would not hit it, and so it wouldn't damage the [s]heetrock, and when I picked the plywood up to slide it forward, I took one step and fell into the [oil] pit.

Savage testified that he picked up the piece of plywood "[t]o about [his] knees" and "was going to slide it forward far enough to where [he] could safely get the [s]heetrock in without hitting the plywood."

¶7. Savage commenced this action against Fairley. Savage alleged that "the premises controlled by Fairley . . . contained a hazardous condition in the form of the [oil] pit that was hidden or concealed by the plywood." Savage further alleged that Fairley "failed to eliminate this dangerous condition and further failed to warn [him] of its existence . . . ." After a trial, the jury returned a verdict that found that Savage had suffered $460,000 in total damages. The jury verdict also allocated fault with 20% assigned to Savage and 80% to Fairley.

¶8. Fairley filed a motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. And, the circuit court denied the motion. It is from this judgment that Fairley now appeals and argues: (1) the circuit court erroneously denied its motion for a JNOV, (2) the circuit court erred in allowing testimony regarding OSHA and the American

3

National Standards Institute (ANSI), (3) the circuit court failed to properly instruct the jury, and (4) the jury verdict is contrary to the overwhelming weight of the evidence.

ANALYSIS

### I.     Sufficiency of the Evidence

¶9.     Fairley argues the circuit court erroneously denied its motion for a JNOV.  A motion for a JNOV challenges the legal sufficiency of the evidence.  *Johnson v. St. Dominics-Jackson Memorial Hosp.*, 967 So. 2d 20, 22 (¶3) (Miss. 2007).  In reviewing the denial of a motion for a JNOV, "[t]his Court will consider the evidence in the light most favorable to the appellee, giving the appellee the benefit of all favorable inferences that may be reasonably drawn from the evidence."  *Anderson v. McRae's Inc.*, 931 So. 2d 674, 678 (¶13) (Miss. Ct. App. 2006).  "If the facts are so overwhelmingly in favor of the appellant that … reasonable jurors could not have arrived at a contrary verdict, this Court must reverse and render."  *Id*.  "On the other hand, if substantial evidence exists in support of the verdict, that is, evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions, then this Court must affirm."  *Id*. (internal quotation marks omitted).

### A.     Savage's Status

¶10.     Savage brought a premises-liability action against Fairley.  "[P]remises liability is a theory of negligence that establishes the duty owed to someone injured on a landowners's premises as a result of 'conditions or activities' on the land . . . ."  *Doe v. Jameson Inn Inc.*, 56 So. 3d 549, 553 (¶11) (Miss. 2011).

¶11. The duty owed by a business owner is determined based on the status of the injured party. The injured party should be classified as an invitee, licensee, or trespasser. *Leffler v. Sharp*, 891 So. 2d 152, 153 (¶10) (Miss. 2004). An invitee is a person who enters the premises of another in response to an "express or implied invitation of the owner or occupant for their mutual advantage." *Id.* at 153 (¶11). A licensee enters the premises "for his own convenience, pleasure, or benefit pursuant to the license or implied permission . . . ." *Id*. A trespasser enters the premises "without license, invitation, or other right." *Id.*

¶12. The general rule is that a property owner is not the insurer of an invitee's safety. Instead, the property owner owes a duty to the invitee to keep the premises reasonably safe and, when not reasonably safe, to warn only of hidden dangers not in plain and open view. *Corley*, 835 So. 2d at 37 (¶2). The property owner owes a duty to a licensee or trespasser to not willfully or wantonly injure them. *Leffler*, 891 So. 2d at 157 (¶12).

¶13. Fairley asserts that Savage was an independent contractor. In *Ratliff v. Georgia Pacific Corp.*, 916 So. 2d 546, 549 (¶9) (Miss. Ct. App. 2005), this Court examined the slight difference between a business invitee and an independent contractor:

> A business invitee is defined as one who enters the premises at the owner's invitation to pursue a matter of mutual advantage. On the other hand, an independent contractor is defined as a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking.

(Citations and internal quotation marks omitted). Ratcliff was also a truck driver, but he was injured while loading his truck. *Id.* at 547 (¶¶2-3). Ratcliff claimed that his injuries were the result of the landowner's negligence. *Id.* The Court ruled that Ratcliff was the employee of

5

an independent contractor and not a business invitee. *Id.* at 549 (¶9).

¶14. Here, the record shows that Savage was properly considered to be an independent contractor. The jury was instructed that "Fairley had a duty to independent contractors such as ProBuild and/or Savage." Accordingly, we find that Fairley's claim regarding Savage's status as an independent contractor is moot.

### B. *ProBuild's Knowledge of the Oil Pits*

¶15. Mississippi Code Annotated section 11-1-66 (Rev. 2004) provides that: "[n]o owner . . . of property shall be liable for the death or injury of an independent contractor or the independent contractor's employees resulting from dangers of which the contractor knew or reasonably should have known." Fairley claims that "ProBuild knew about the oil pits" and that ProBuild's "knowledge of the presence of the oil pits was imputed to Savage." To support this claim, Fairley relies on the testimony of John Cummings, ProBuild's manager, and Stephen Fairley, Fairley's president.

¶16. Cummings testified that he arrived at the construction site after the accident. Cummings stated that it was obvious to him that the facility was an oil-change station. Cummings said, "it was a Quick Lube, Jiffy Lube whatever it was . . . . I recognize that by the spaces of the plywood that was down covering the holes . . . . You could tell that those were oil bays." Yet, there was no evidence presented that Cummings "knew about the oil pits" before the accident occurred.

¶17. Stephen Fairley testified about his conversation with David Oglesbee, ProBuild's salesman, about the oil pits:

6

[Fairley's counsel]: [Y]our first order with ProBuild, can you tell me what materials were you ordering that day?

[Stephen]: This is 2 by 4's, some 4 by 8, three-quarter plywood, that's concrete form board. Some 2 by 6's, nails. That's what's on that invoice.

[Fairley's counsel]: Okay, and, of course, at the top of this invoice that ProBuild made where Mr. Savage was and worked, it says shipped to. You see where it says Quick Lube?

[Stephen]: Yes, ma'am.

[Fairley's counsel]: Okay, these materials that you were ordering from Mr. Savage's employer, what were these materials used for?

[Stephen]: This particular invoice, the first one here, was where we constructed the pit. It's all the plywood and everything to form the concrete basement in the pit.

[Fairley's counsel]: Okay, the pit and to get this order, would you have called ProBuild and had a conversation with your salesman?

[Stephen]: Yea, I'd have called David.

[Fairley's counsel]: Okay, and do you recall that first conversation you had with ProBuild?

[Stephen]: I mean the first one, we normally give him - you know, let him know that, hey, we need a sub-account set up because we're starting a new job; so that all those tickets gets labeled to that job; so that the ladies in the office will know what job to put it to, and then I give him the order, and he's always like what do you - what are y'all doing, and I said, well, this is to construct the Quick Lube we're starting in Wiggins. We're going to be building a pit.

[Fairley's counsel]: Okay, and in placing this order, did you talk with ProBuild about having to build pits?

[Stephen]: I talked to David.

7

[Fairley's counsel]: Okay, and David's with ProBuild, right?

[Stephen]: Right, right. The salesman.

[Fairley's counsel]: And he's in the same office as Mr. Savage, correct?

[Stephen]: Right. He is the point of contact we have.

Despite Stephen's testimony that he spoke with David regarding Fairley's purchase order, David did not testify and therefore did not verify or confirm the conversation.

¶18. Although Fairley claims ProBuild's knowledge of the oil pits is "undisputed," the testimony suggests otherwise. The disputed issue, i.e., whether ProBuild had knowledge of the oil pits before Savage's accident, was presented to and resolved by the jury.

### C. Savage's Knowledge of the Oil Pits

¶19. Fairley also claims that Savage knew or should have known of the presence of the oil pits. Specifically, Fairley asserts both the invoice and delivery ticket identified the site location as a "Quick Lube." Although Savage acknowledged this fact, he testified that he does not have anything to do with the invoices. Savage further explained that although he received the delivery ticket, it had handwritten directions stapled to the front of it.

¶20. Savage also testified that he had never been to the job site before his accident and that the quick-lube facilities he had been to prior to his accident "had lifts where they would lift the vehicle up, and they would go up under to change the oil." Savage stated that prior to his accident, he had not seen a quick-lube facility with oil pits.

¶21. Savage further testified that upon his arrival to the construction site, he visually inspected the site area to determine where the easiest and safest place was to unload the

8

sheetrock. Savage stated there was no indication that the area was a quick-lube facility or had oil pits underneath it. He further stated that at the time of delivery, no one from Fairley was present on the job site.

¶22. Although Fairley claims the oil pits were obvious, Savage repeatedly testified that there was no indication of the presence of oil pits or any holes underneath the plywood. Moreover, Savage emphasized there was no indication of any kind of hazard.

¶23. Savage's expert witness, James Dunaway, also testified that the facility was not obviously an oil-change location. Specifically, Dunaway stated, "it wasn't obvious to me; if I hadn't have known that that's what it was . . . [i]t wouldn't have been obvious to me."

### D. Savage's Control of the Work

¶24. Fairley next claims liability is precluded because Savage was in complete control of the nature and details of his work. In support thereof, Fairley relies on *Ratliff*. In *Ratliff*, Ratliff went to a Georgia Pacific plant to pick up a load of particle board for his employer. *Ratliff*, 916 So. 2d at 547 (¶2). There was no contract between Georgia Pacific and Ratliff's employer other than a bill of lading that required the load to be protected from the weather. *Id*. Georgia Pacific provided Ratliff with clear plastic and tarpaulin to cover the load and Ratliff's employer provided straps to secure the plastic and tarpaulin. *Id*. at (¶3). While spreading the tarpaulin over the load, Ratliff fell from the top of the load to the concrete below and was injured. *Id*. Ratliff sued Georgia Pacific for failing to provide him with a safe working environment. *Id*. at 547-48 (¶4). Georgia Pacific subsequently filed a motion for summary judgment, which the circuit court granted. *Id*. at 548 (¶7). Ratliff appealed to

9

this Court. *Id.*

¶25. On appeal, we emphasized that generally a premises owner has a duty to provide an independent contractor or the independent contractor's employee with a reasonably safe place to work or to warn of danger. *Id*. at 549 (¶10). However, the owner is relieved of that duty if the independent contractor is aware of the danger or the danger "arises out of or is intimately connected with the work to be performed by the independent contractor." *Id*.

¶26. We noted that Georgia Pacific "merely provided the load and the material to be used to cover it" and "did not . . . direct Ratliff as to his method for covering and securing the load." *Id*. at (¶11). Moreover, we found the "danger posed to Ratliff [in spreading and securing the load] arose out of or was intimately connected with his duties as a truck driver." *Id*. As a result, we determined that Georgia Pacific owed no duty to Ratliff and affirmed the circuit court's entry of summary judgment. *Id.* at 549-50 (¶13).

¶27. We find Fairley's reliance on *Ratliff* is misplaced. Ratliff's injury occurred when he fell from the flatbed truck he drove for his employer while securing the load on the truck. *Id*. at 549 (¶11). Here, Savage's injuries occurred when he fell into an oil pit, which was unknown to Savage and located on Fairley's premises. Unlike in *Ratliff*, the danger of falling into an oil pit did not arise out of and was not intimately connected with the work Savage performed as a delivery driver.

### E. Reasonably Safe Work Environment

¶28. Fairley last claims it provided a reasonably safe place to work and is therefore not liable for Savage's injuries. *See id*. at 549 (¶10) (noting that a premises owner has a duty to

provide an independent contractor's employee with a reasonably safe place to work). However, Dunaway, an expert in the field of construction safety, opined that Fairley's maintenance of the construction site was not consistent with commonly accepted industry standards. Specifically, Dunaway opined that Fairley's maintenance was inconsistent with industry standards of what's expected of a hole cover. Dunaway testified that "[n]ot knowing there was a hole and lifting the plywood for the purpose of moving it out of the way" caused Savage to fall into the oil pit.

¶29. In response, Fairley offered Stephen's testimony that he thought laying unsecured sheets of plywood over the open holes in the floor was sufficient. However, as Savage explained to the jury, there was no reason to believe that there was a hole underneath the plywood. Although he acknowledged that had he looked under the plywood, he would have seen the hole, Savage emphasized that prior to his fall, there was no indication of any danger under the plywood.

¶30. Fairley asserts that even if the exposed oil pit constituted a dangerous condition, Savage, not Fairley, created it. Fairley argues the "sole proximate cause of Savage's alleged injuries was his decision to lift the plywood and step forward." However, Dunaway explained that the hole covers so much space that a piece of plywood would need to be fastened down and opined that Savage's injuries were caused by the exposed oil pit.

¶31. Additionally, Dunaway advised the jury that he has "investigated a lot of accidents" and did not find Savage's actions to be unsafe. Indeed, Dunaway stated that "it's not an unsafe practice to pick up a piece of plywood."

11

¶32. Considering the evidence in the light most favorable to Savage, we find sufficient evidence was presented to support the verdict. The record shows that the jury heard testimony from both parties and was instructed on Fairley's defense. Specifically, the jury was instructed that Savage was an independent contractor and that Fairley "[did] not have a duty to warn of a danger or defect that was known to . . . Savage and/or which should have been known to . . . Savage if he had been exercising ordinary care." Because sufficient evidence exists to support the verdict, Fairley's motion for a JNOV was properly denied.

## II. Admission of Evidence

¶33. Prior to trial, Fairley filed a motion in limine to exclude evidence concerning OSHA. The circuit court granted the motion in part and held that "evidence of OSHA regulations was only admissible at trial for the limited purpose of demonstrating reasonable care consistent with industry standards with a limiting instruction . . . the parties [were] . . . prohibited from all other references, testimony or evidence concerning OSHA . . . ."

¶34. Fairley argues that the court erred in allowing testimony regarding OSHA. "The admission or suppression of evidence is within the discretion of the [circuit court] and will not be reversed absent an abuse of that discretion." *Accu-Fab & Const. Inc. v. Ladner*, 778 So. 2d 766, 771 (¶21) (Miss. 2001), *overruled on other grounds by Mack Trucks Inc. v. Tackett*, 841 So. 2d 1109 (Miss. 2003).

¶35. OSHA regulations are not admissible to show negligence on the part of the defendant. *Sumrall v. Miss. Power Co.*, 693 So. 2d 359, 367 (Miss. 1997). However, Mississippi Rule of Evidence 105 provides that evidence not admissible for one purpose may be admissible

12

for another purpose provided a proper limiting instruction is given. *Accu-Fab*, 778 So. 2d at 771 (¶20). In *Accu-Fab*, the Mississippi Supreme Court held that OSHA regulations were not admissible to show negligence but could "be used as a measure of reasonable care consistent with industry standards." *Id*. at (¶21).

¶36. Here, as in *Accu-Fab*, the court allowed testimony regarding the OSHA regulations "for the limited purpose of demonstrating reasonable care consistent with industry standards." Moreover, the circuit court gave a limiting instruction that advised the jury that "OSHA standards are not to be considered in determining whether Fairley was negligent" but may be considered "only for the limited purpose of determining what constitutes reasonable care consistent with industry standards." We do not find the circuit court abused its discretion in allowing testimony regarding the OSHA regulations for such limited purposes.

¶37. Fairley further argues the circuit court erred in allowing Savage's expert to testify as to Exhibits 9, 11, and 22. Exhibit 9 is a set of OSHA regulations; Exhibit 11 is a list of OSHA-related incidents nationwide; Exhibit 22 is ANSI-related materials. Prior to trial, the circuit court excluded Exhibits 9, 11, and 22. Specifically, the circuit court found that Savages's expert, Dunaway, could rely on the exhibits and testify regarding OSHA regulations and ANSI standards "to demonstrate what is reasonable care consistent with industry standards, but that said exhibits [c]ould not be admitted into evidence or shown and/or provided to the jury."

¶38. Fairley asserts that despite being marked for identification only, Dunaway was permitted to read from Exhibit 22. However, Fairley failed to object. Indeed, when

13

Dunaway was asked to "tell the jury what [the second sentence of paragraph 7.1 of Exhibit 22] provides," Fairley did not object. Fairley did not object at any point during Dunaway's recitation of the exhibit. In fact, the record shows Fairley objected only twice during Dunaway's entire direct examination, and neither objection involved OSHA and/or ANSI.

¶39. Fairley asserts no objection was necessary due to its previously filed and ruled-upon motion in limine. However, although the circuit court ruled that OSHA regulations and/or ANSI standards were admissible for the limited purpose of demonstrating reasonable care consistent with industry standards, the court clearly excluded the exhibits and advised that the exhibits could not be admitted into evidence or provided to the jury. Thus, when Dunaway was asked to read from the exhibits or to tell the jury what the exhibits provided, Fairley should have objected if it thought that such testimony was improper or inconsistent with the circuit court's pretrial ruling.

¶40. Because Fairley failed to object, it cannot now claim that the circuit court erroneously allowed Dunaway to testify as to the exhibits. *See Davis v. Estate of Tiblier*, 107 So. 3d 181, 184 (¶9) (Miss. Ct. App. 2013) (determining that the "failure to object in the trial court waives any objection on appeal"); *see also Trustmark Nat. Bank v. Jeff Anderson Reg. Med. Ctr.*, 792 So. 2d 267, 278 (¶32) (Miss. Ct. App. 2000) ("Failure to raise a contemporaneous objection constitutes a waiver of the issue on appeal."). Regardless, we also note that the jury was instructed on the limited purpose for which industry standards such as OSHA may be considered.

### III.  Jury Instructions

14

¶41. Fairley next argues that "errors within the jury instructions warrant a new trial." We separately address each jury instruction at issue, but note that our standard of review is the same. "This Court reviews the giving or refusal of jury instructions for an abuse of discretion." *Magers v. Diamondhead Resort LLC*, 224 So. 3d 106, 109 (¶6) (Miss. Ct. App. 2016). "When jury instructions are challenged on appeal, we do not review them in isolation: rather, we read them as a whole to determine if the jury was properly instructed." *Id*. at 110 (¶6) (internal quotation marks omitted). "If the jury instructions, read as a whole, fairly announce the law of the case and create no injustice, no reversible error will be found." *Id*.

### A. Jury Instruction D-1

¶42. Fairley argues that the court erred in refusing its peremptory instruction, D-1. As previously discussed, Fairley was not entitled to a directed verdict. Thus, the jury instruction was properly denied.

### B. Jury Instructions D-8 and D-11

¶43. Fairley also argues that the court erred in refusing jury instructions D-8 and D-11 since each instruction "is a sound statement of the law." However, simply because it may be a "sound statement of the law" does not require that the instruction be given. D-8 and D-11 both refer to dangers or injuries arising out of or intimately connected with the work performed by Savage. As previously discussed, there was no evidence that the hole or oil pit into which Savage fell arose out of or was intimately connected with his work as a delivery driver. Thus, the circuit court did not err in refusing the instructions.

### C. Jury Instruction D-10

¶44.    Fairley next argues that the court erred in refusing jury instruction D-10, which instructed the jury that "knowledge by an independent contractor (such as ProBuild) that a condition exists on certain premises is imputed to its employees." Fairley relies on Stephen's testimony that he had a conversation with ProBuild's salesman, David, about the oil pits. The circuit court found this testimony to be "questionable" and refused the instruction. However, the circuit court advised that Fairley could still "argue it." Thus, although the jury was not formally instructed by the court on the issue, Fairley was able to address the issue with the jury. We do not find the circuit court abused its discretion in refusing jury instruction D-10.

### D.    Jury Instruction D-12

¶45.    In jury instruction D-12, Fairley sought to instruct the jury regarding the standards set forth by OSHA. The circuit court gave the instruction in its entirety except for one sentence, which read: "The Court instructs the jury that OSHA standards are not the law." Fairley now claims the circuit court erred in limiting the jury instruction.

¶46.    The circuit court's amendment to the instruction was not an abuse of discretion. Pursuant to *Accu-Fab*, jury instruction D-12 properly advised the jury that it could consider OSHA standards for the limited purpose of determining what constitutes reasonable care consistent with industry standards. *Accu-Fab*, 778 So. 2d at 771 (¶21). Accordingly, the instruction was properly given.

### E.    Jury Instructions P-12, C-6, and C-7

¶47.    Fairley last argues that the court erred in giving jury instructions P-12, C-6, and C-7.

16

P-12 instructed the jury as follows:

> The defendant had a duty to exercise reasonable care to keep the premises in a reasonably safe and suitable condition and to warn the plaintiff of hidden or concealed danger which Fairley Construction knew or should have known existed. If you find that Fairley Construction failed to warn the plaintiff of a hidden danger which Fairley Construction knew or should have known existed, then you should find in favor of the plaintiff.

Jury instructions C-6 and C-7 further instructed the jury that Fairley had a duty to an independent contractor such as ProBuild and/or Savage to keep the premises in a reasonably safe condition or, if not reasonably safe, to warn ProBuild and/or Savage of dangerous conditions not obvious or apparent to Savage.

¶48. Fairley claims jury instruction P-12 "amounts to a heightened duty on the part of Fairley, e.g. it must warn even if the premises is safe." We disagree.

¶49. When read together with instructions C-6 and C-7, P-12 fairly instructs the jury regarding Fairley's duty. Indeed, the instructions make clear that Fairley had a duty to provide an independent contractor with a reasonably safe work environment or to warn of danger. *Ratliff*, 916 So. 2d at 549 (¶10).

¶50. Fairley further claims the instructions "fail to consider the exceptions applicable to independent contractors." However, other instructions were given which advised the jury of Fairley's defense. Specifically, D-9 instructs the jury that "Fairley does not have a duty to warn of a danger or defect that was known to . . . Savage and/or which should have been known to . . . Savage if he had been exercising ordinary care." Overall, we do not find the circuit court abused its discretion in giving jury instructions P-12, C-6, and C-7.

IV.    *Weight of the Evidence*

17

¶51. Fairley last argues the jury verdict "is contrary to the overwhelming weight of the evidence and evinces bias, passion and prejudice on the part of the jury and is an unconscionable injustice." We disagree.

¶52. "The standard of review on a motion for a new trial is abuse of discretion." *Johnson,* 967 So. 2d at 23 (¶8). "When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id*.

¶53. Here, the jury heard from both parties and resolved any conflicts of evidence presented at trial. *See id.* at (¶10) (Any "conflicts of evidence presented at trial are to be resolved by the jury."). "The jury was free to accept or reject any or all of the testimony and evidence presented." *Id*. at (¶11). The jury chose to accept the testimony that supported Savage. We do not find that the overwhelming weight of the evidence is contrary to the jury's verdict. Thus, the circuit court did not abuse its discretion in denying the motion for a new trial.

¶54. **AFFIRMED.**

**BARNES, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR. WILSON, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**

18